## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

SILICIA ANIQUE JACKSON,

                    Plaintiff,

   - against -

THE CITY OF NEW YORK;

                   Defendant.

**COMPLAINT** ___ CV ___ ( ___ )

**JURY TRIAL DEMANDED**

## INTRODUCTION

This case raises the question of whether a municipal government can disregard its legal obligations under Title VII of the Civil Rights Act of 1964, as well as parallel state and local anti-discrimination laws, by denying a religious accommodation based on nothing more than conclusory assertions.

Specifically, the municipality refused to accommodate Plaintiff's sincerely held religious beliefs by citing "undue hardship" and "direct threat" without offering any concrete evidence to support those claims.

At the same time, by allowing other employees and patrons to enter and use government spaces without undergoing vaccination or testing requirements. the municipality undermined its own justification for denying the accommodation.

Plaintiff seeks relief for religious discrimination, failure to accommodate, and other violations of her civil rights under federal, state, and city law.

## PARTIES

1. Plaintiff in this case is SILICIA ANIQUE JACKSON ("Plaintiff"). Plaintiff's home address is 35 Stage Lane, Staten Island, NY 10304.

2. Defendant, THE CITY OF NEW YORK ("City"), is a municipal corporation organized under the laws of the State of New York, with its principal offices located at 100 Church Street, New York, NY 10007. At all times relevant to this action, the City acted through various agencies and departments, including but not limited to:

   - The Office of the Mayor ("City Mayor's Office");

   - The Equal Employment Opportunity Office ("City EEO");

2

- The NYC Parks Office of Diversity, Equity, Inclusion, and Belonging ("City Parks DEIB");

- The NYC Department of Parks and Recreation ("City Parks")

- Citywide Aquatics ("City Aquatics")

The City is legally responsible for the policies, practices, customs, and conduct of its departments, agencies, officials, and employees.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Constitution and laws of the United States, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First Amendment, Equal Protection Clause, and Due Process Clause of the U.S. Constitution.

4. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), as the unlawful actions arose within this District. Defendant also conducts business in this District, including making hiring decisions relevant to the allegations in this Complaint.

5. Defendant, City, is a municipal agency of the State of New York and regularly conducts business in this District, including making hiring and employment-related decisions at its Manhattan headquarters.

6. Plaintiff exhausted all administrative remedies under Title VII. Plaintiff filed a charge of discrimination with the EEOC, received a Notice of Right to Sue, and is filing this action within 90 days of receiving that notice. (Exhibit 1)

7. This Court has supplemental jurisdiction over Plaintiff's claims arising under New York State and New York City law pursuant to 28 U.S.C. § 1367(a), as those claims form part of the same case or controversy under Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**Legal Background:  City Orders COVID-19 Vaccine Requirement For City Employees**

8. In early 2020, the World Health Organization declared a global pandemic alleging that there was an outbreak of a novel virus, "Sars Cov 2," ("Virus") which was said to cause the disease "COVID-19."

9. Beginning in March 2020, the City responded by enacting a series of public health orders for City employees. Under the administrations of Mayor Bill de Blasio, Mayor Eric Adams, and Health Commissioner Dr. Dave A. Chokshi, City employees were initially required to either receive a COVID-19 vaccine ("C19 Vaccine") or submit to regular PCR testing as a condition of employment. The rationale was that the vaccine would reduce symptoms and transmission of the Virus, while PCR testing would identify asymptomatic infected individuals before they could spread the Virus.

10. In late 2021, the City rescinded the testing alternative, asserting that testing alone was insufficiently safe, and required municipal workers to show proof of full COVID-19 vaccination or face unpaid leave or termination.

**Plaintiff Was Qualified and Had Prior Experience Working for City**

11. On 02/24/21, Plaintiff applied for the position of Aquatics Specialist (also referred to as "Recreation Specialist") with City Parks. The role primarily involved teaching swim classes to tots, children, adults, and seniors; supervising lap swim sessions; and serving as an Aquatics Director at summer camps.

12. On 03/22//2021, Plaintiff interviewed for the Aquatics Specialist position. While waiting to be interviewed, a City Parks onboarding staff member named "Rodney" informed Plaintiff of the two most important safety protocols likely to be discussed during the interview: (1) prohibiting pool patrons from holding their breath underwater for extended periods, and (2) refraining from jumping into the pool to rescue swimmers in distress. Instead, Aquatics Specialists were instructed to throw or extend a flotation device to the swimmer because only certified lifeguards were authorized to physically rescue distressed swimmers or perform emergency measures such as CPR or defibrillation.

13. On 06/22/2021 and 06/27/2021, Plaintiff completed the two specialized certifications required for the Aquatics Specialist role: CPR certification (personally funded) and the Water Safety Instruction ("WSI") certification, which was funded by City Parks at a value of approximately $475.

14. Again, the same safety point about only let the life guards save swimmers was reiterated to the Plaintiff again at the City Parks funded WSI training.

15. Plaintiff was eventually hired by City Parks and employed from 7/6/2021 – 9/1/21 in the role of Aquatics Specialist. However, due to staffing shortages and limited pool operations on Staten Island during those months, Plaintiff was reassigned to two NYC Parks playgrounds—

Rev. Dr. Maggie Howard Playground and Levy Playground—and one summer camp located at Jennifer's Playground.

16. Plaintiff's duties at the playgrounds included distributing sports equipment, board games, and arts and crafts supplies to children; maintaining park cleanliness; and assisting with NYC Parks programming and events.

17. During this period, then-Mayor Bill de Blasio had declared a state of emergency related to the COVID-19 pandemic for City workers, and therefore, the Plaintiff was required to wear a face mask and maintain six feet of social distance from staff and patrons at all times.

**Plaintiff Reapplies For "Aquatics Specialists" Job and is Told "You Got The Job"**

18. On 03/17/2022, Plaintiff received a phone call from Candace Senior, the City's Aquatics Project Development Coordinator. Senior inquired whether Plaintiff would be interested in reapplying for the Aquatics Specialist position for Summer 2022. Plaintiff confirmed her interest and agreed to reapply.

19. On 03/24/2022, during her job interview, John Hutchins, Director of Citywide Aquatics, told Plaintiff: "You got the job," provided that she renewed her expired CPR certification. (Plaintiff's WSI certification remained valid at the time.)

20. Plaintiff completed the BLS Provider Certification (a.k.a. CPR Certification) required for the Aquatics Specialist role. At that point, Plaintiff held all the necessary qualifications for the Aquatics Specialist position to the best of her knowledge.

21. On 6/7/2022, Plaintiff was scheduled for her job processing appointment with NYC Parks. At that appointment, job candidates confirm their identity, undergo a background check, complete employment paperwork, and sign a job commitment form. In the confirmation email, Plaintiff was instructed to bring several documents—including her COVID-19

"Vaccine Card." The purpose of the vaccine card was to indicate whether the applicant was had her full COVID-19 vaccination shots.

**Plaintiff Has Sincerely Held Religious Beliefs that Conflict with the City's Job/Hiring Vaccine Requirement(s)**

22. Plaintiff identifies as a *Starseed*, a sincerely held spiritual belief that encompasses her understanding of existence before, during, and after her life on Earth, as well as her moral values and life purpose.

23. Plaintiff believes that a higher governing body of intelligent beings—referred to as the *Creators*—oversee and guide Earth's activities. According to her belief, these Creators pair souls with human bodies and place individuals on Earth to live. Most people are placed on Earth to pursue personal goals and many of the souls originate for Earth. What makes the Plaintiff a Starseed is her soul originates from outside of Earth (hence the term "Star") and she was placed on as Earth as missionary to influence (hence to the term "seed") the future trajectory of Earth.  Plaintiff believes that she is part of a larger plan to help preserve Earth and the human ecosystem to enable humans to survive and thrive on Earth in the future.  The Plaintiff believes she was chosen for the mission because of her unique soul (the energy part of her), character and her personal commitment to telling the truth —especially in the face of very challenging circumstances.

24. Plaintiff further believes that when she deviates from her spiritual mission, the Creators send her signs—ranging from subtle to severe—to guide her back on course. She receives their messages through meditation, prayer, visions, dreams, synchronicities, recurring symbols, auditory cues and subtle energetic frequencies. Failure to heed these messages, she believes, could delay or jeopardize her mission, or result in her reincarnation to attempt the mission

again (in another life). Plaintiff's ultimate goal is to return to the Heavens, an ethereal realm in the Vega Star System, which she believes she comes from.

25. Faced with widespread discussions and concerns about COVID-19 protocols, Plaintiff sincerely sought clarity from her Creators to ensure she remained aligned with her spiritual obligations. She received the following direction:

- COVID-19 Vaccine and mRNA Therapies: The Creators instructed her not to receive any COVID-19 vaccinations or mRNA-based therapies, as doing so would interfere with her Creator-designed physical body, spiritual integrity, soul mission, and ultimate ascension.

- COVID-19 Testing (PCR swab and saliva tests): The Creators informed her not to undergo any form of COVID-19 testing, as it would compromise her designated spiritual role on Earth and interfere with her life's mission.

- Masking: Plaintiff did not receive specific spiritual guidance regarding mask-wearing.

26. Based on this spiritual guidance, Plaintiff was unable to comply with the City's employment requirements mandating COVID-19 vaccination and testing. However, she did not have a religious or spiritual objection to wearing a mask.

**Plaintiff Notifies City of Religious Conflict and Requests Reasonable Accommodation**

27. On 6/14/2022, Plaintiff notified City Parks that she was unable to submit a vaccine card at her job processing event because taking any COVID-19 vaccine was against the Plaintiff's sincerely held religious beliefs. The Plaintiff requested a reasonable accommodation and suggested that she be allowed to attend her job onboarding event without the vaccine card.

28. On 06/14/2022, Plaintiff was directed by Candace Senor to send the Plaintiff's religious exemption request to the City EEO division at eeo@parks.nyc.gov.

29. On 6/14/2022, Plaintiff notified the City EEO/DEIB department and explained her religious objection to the COVID-19 vaccine. She formally requested a reasonable accommodation from the vaccine requirement.

30. On 06/14/2022, City EEO/DEIB staff requested Plaintiff to fill out documents and answer questions to complete her religious exemption application.

31. On 06/30/2022, City EEO/DEIB staff explained to the Plaintiff that engaging in a cooperative dialogue was a necessary component of completing one's religious exemption application.

32. On 07/8/2022, staff from the City EEP/DEIB granted the Plaintiff an accommodation to the COVID-19 vaccine requirement because it would not be an undue hardship to the "Agency." to do so.   However, as a condition of the accommodation, Plaintiff was now required to undergo weekly PCR testing.

33. On 7/11/2022, Plaintiff notified City EEO/DEIB, that submitting to weekly PCR testing also conflicted with Plaintiff's sincerely held religious beliefs. Plaintiff requested a reasonable accommodation from the testing requirement and preemptively answered the same questions and filled out the same forms that she did for the religious exemption request for the COVID-19 vaccine requirement. In those documents and in her questions, Plaintiff explained her religious conflict with the COVID-19 testing requirement and the Plaintiff suggested that the reasonable accommodation could be to be excused from the testing requirement.

34. On7/18/2022, the City EEO/DEIBO denied Jackson's request for a reasonable accommodation from the weekly PCR Testing requirement.

35. On 7/20/2022, Plaintiff asked the City EEO/DEIB to provide a reason for the denial of a reasonable accommodation to "Undergo weekly PCR testing."

36. On 7/25/2022, Iyana Titus from the City DEIB replied to Plaintiff via email: "At this juncture, we will not entertain any kind of reasonable accommodations request not to undergo PCR testing. As an alternative, you are always more than welcome to get vaccinated." The option suggested by Iyana Titus to get tested to vaccinated were not only not possible for the Plaintiff, but the Plaintiff had already notified the City EEO/DEIB that vaccination and PCR testing were in conflict with the Plaintiff's sincerely held religious beliefs.

37. On 7/25/2022, Plaintiff informed City EEO/DEIB that the Plaintiff had to appeal the City EEO/DEIB decision to deny her a reasonable accommodation to the COVID-19 testing requirement. Plaintiff requested information on how to appeal the City EEO/DEIB decision.

38. On 7/26/2022, City EEO instructed Plaintiff to search the Internet for the DCAS' EEO reasonable accommodation procedural guidelines to learn about how to appeal a religious accommodation denial.

39. When Plaintiff performed an Internet search, Plaintiff found three "DCAS documents:

- Equal Employment Opportunity Policy: City of New York 2021
- Reasonable Accommodation Procedural Guidelines" (Document Revised: December 31, 2021)
- "Equal Employment Opportunity Policy, City of New 2021 (Document Revised: December 31, 2021).

From the three documents, the Plaintiff learned during the religious exemption requests and review for testing, a good faith cooperative dialogue was supposed to take place to discuss a possible reasonable accommodation, the applicant's accommodation needs, potential

accommodations, the difficulties that the potential accommodations may pose for the agency, and alternative accommodations. The objective of a cooperative dialogue is to determine the appropriate reasonable accommodation. To not do participate in a cooperative dialogue would be a violation of law.

40. The City failed to engage in a cooperative dialogue as required under the *Equal Employment Opportunity Policy: City of New York 2021*, and no interactive process occurred prior to the denial of Plaintiff's request.  The City would not entertain the request at all.

**Plaintiff's Appeal Is Denied**

41. On 08/01/2022, Plaintiff appealed the City's denial of the reasonable accommodation to PCR Testing The appeal was sent via email to Parks' Chief of Personnel, David Terhune ("Terhune") as the City EEO/DEIB identified Terhune as the person to send the appeal to.  In the appeal to Terhune, Plaintiff suggested that a reasonable accommodation to PCR Testing could be an exemption from the requirement.

42. On 08/15/2022, Terhune denied Plaintiff's appeal. Terhune's reason for the denial he stated was because "such a request places an undue hardship on the agency."

43. On 08/18/2022, Plaintiff asked Terhune to "explain how being exempt from testing creates an undue hardship to the agency?"

44. On 08/23/2022, Terhune stated, "The hardship is the danger in which you place other employees and the public by not being vaccinated and not testing regularly. You were granted an accommodation from the vaccine, but the regular testing must be followed."

45. According to the *Reasonable Accommodation Procedural Guidelines* issued by DCAS:

- If a particular accommodation imposes an undue hardship, an agency must consider whether an alternative accommodation is available that does not impose undue hardship.

- No accommodation is categorically excluded as a potential reasonable accommodation under the New York City Human Rights Law.

- A reasonable accommodation could include modifications to policies, practices, procedures and work assignments.

- A determination that someone would be a "direct threat," causing significant health & safety issues, needs to be made via an individualized assessment based on reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence in compliance with Section 72 of the New York Civil Service Law.

- A denial of reasonable accommodation must be made in writing and explain the basis for the decision to the applicant.

46. According to the DCAS documents, Terhune failed to:

- Consider alternative accommodations to weekly PCR testing,

- Conduct an individualized assessment to determine whether Plaintiff posed a "direct threat" to health or safety, as required by law and DCAS policy, and

- Provide a sufficient written explanation supported by medical or objective evidence.

47. Terhune's denial of Plaintiff's request for reasonable accommodation ultimately prevented Plaintiff from being hired for the Aquatics Specialist position for the 2022 summer season at City Parks.

**City Gives Mixed Messages About Whether Vaccines & Testing Are Really Necessary For Public Safety**

48. On 03/12/2020, former Mayor Bill de Blasio declared a public health emergency due to the COVID-19 pandemic, stating that the virus posed a significant threat to the health and safety of New York City residents.

49. On 08/03/2021, via Executive Order No. 225, Mayor de Blasio issued a proof-of-vaccination requirement for individuals accessing indoor recreational venues, including City Parks recreation and nature centers.

50. On 08/03/2021, via Executive Order No. 75, Mayor de Blasio mandated that all new City hires must be vaccinated unless granted a medical or religious exemption through the reasonable accommodation process. Employees granted such exemptions were permitted to undergo COVID-19 testing in lieu of vaccination.

51. On 08/31/2021, via Executive Order No. 78, Mayor de Blasio expanded the vaccination mandate to require all City employees to be fully vaccinated.

52. On 10/29/21, City Health Commissioner Dr. Dave A. Chokshi, exercising his authority under the New York City Charter and Health Code to address public health emergencies, issued an order requiring all City employees to provide proof of at least one dose of a COVID-19 vaccine by 5:00 PM on 10/29/2021, or be placed on unpaid leave. This order eliminated the previous option for unvaccinated employees to undergo weekly COVID-19 testing in lieu of vaccination (Executive Order 83).

53. On 02/14/2022, newly elected Mayor Eric Adams confirmed his intent to maintain the COVID19 vaccination requirement for City workers. That same day, over 1,400 unvaccinated City employees were terminated for non-compliance. This action confirmed that the mandate remained in effect despite changing public health circumstances.

54. On 03/04/2022, via Executive Order No. 50, Mayor Adams lifted the vaccination requirement for people entering indoor recreational sites, including City Parks recreation and nature centers. A City Parks press release article published on 03/07/2022, states "Effective March 7, 2022, proof of vaccination, temperature checks, and health screenings are no longer required to enter our recreation centers and nature centers. Masks are strongly encouraged."

55. People accessing outdoor park spaces such as green spaces, playgrounds, and picnic areas were never subject to vaccination or testing requirements.

56. On 02/10/2023 Mayor Adams rescinded the vaccination and testing requirements for City employees.

57. The City's shifting and inconsistent COVID-19 policies reflected contradictory approaches that undermined the rationale of a compelling public health and safety interest.

58. At various times, City employees were required to be vaccinated, or—if granted a religious exemption—submit to regular COVID-19 testing, while patrons of City Parks and recreation facilities were not held to the same standard.

59. Although City health officials claimed that regular testing was not an adequate substitute for vaccination, the City still allowed some employees to test in lieu of vaccination. These inconsistencies suggest that the COVID-19 protocols were applied in an arbitrary and selectively enforced manner.

60. These contradictory policies are relevant to whether denying the Plaintiff's accommodation request—specifically her request not to undergo PCR testing—was truly necessary to achieve a legitimate public health goal, or whether the City's actions were discriminatorily applied.

**Disparate Treatment**

61. The City required all municipal employees to be vaccinated as a matter of public health and safety. However, it simultaneously lifted COVID-19 requirements—such as vaccination, testing, or masking—for patrons of City facilities, including parks, recreation centers, libraries, and administrative offices. This inconsistent policy remained in effect for approximately eleven (11) months.

62. City employees were required to comply with vaccination mandates regardless of whether their roles were performed indoors or outdoors. In contrast, members of the public using outdoor parks and recreational spaces were never subject to vaccination, testing, or masking requirements at any point during the COVID-19 pandemic.

63. This disparate treatment calls into question the City's claimed justification for denying Plaintiff's request for a religious accommodation based on public safety. If unvaccinated and untested individuals were freely allowed to use City facilities, there was no legitimate, non-discriminatory reason to deny Plaintiff's accommodation request on safety grounds.

64. By enforcing vaccine and testing requirements on employees but exempting the public from these same requirements, the City engaged in disparate treatment that unfairly burdened the Plaintiff's religious exercise without sufficient justification.

**Questionable City Practices Debunking City's Justification For Mandatory Testing For Public Health**

65. During the summer of 2021, Plaintiff frequented Lyons Pool, which is likely where she would have worked had she been hired as an Aquatics Specialist that summer.

66. From June 2021 – September 2021, the City had required patrons to wear mask in its facilities including outdoor pools. While at Lyons Pool, Plaintiff observed that patrons were required to wear masks inside the pool facility, including in locker rooms, bathrooms, and on the pool deck. However, masks were not required while swimming in the pool itself. Due to staff shortages that summer, the pool was often divided into halves or thirds, confining all swimmers into just one of those areas. This resulted in crowded conditions where many patrons swam in close proximity, unmasked and without any requirement for vaccination or COVID-19 testing.

67. Plaintiff also observed similar crowded conditions at other smaller mini pools, such as the P.S. 14 Playground at the Rev. Dr. Maggie Howard Playground and the West Brighton Pool. During the summer of 2022, patrons—mostly children—were not subject to mask mandates, COVID-19 testing, vaccination, or social distancing requirements, despite the Plaintiff's reasonable accommodation request being denied.

68. In the summer of 2022, while awaiting the outcome of her religious exemption requests, Plaintiff visited Lyons Pool and Faber Park Pool on multiple occasions (6/30/2022, 7/7/2022, 7/17/2022, 7/19/2022, 7/22/2022, 7/23/2022, and 7/24/2022). Due to ongoing lifeguard shortages, pools were again limited to reduced sizes—sometimes only one-third of the pool— resulting in up to 80 patrons swimming in a crowded pool simultaneously without masks, social distancing, COVID-19 testing, or vaccination requirements. Lyons Pool is the location where Plaintiff would most likely have worked in the summer of 2022 had she been hired.

**City Blatantly Disregards Public Health That They Claim To Be So Concerned About**

69. 05/27/2022, Plaintiff received a personal invitation to Mayor Adams' "Caribbean-American Heritage Reception."

70. On 6/8/2022, Plaintiff confirmed attendance to Mayor Adams' Caribbean-American Heritage Reception and the Plaintiff received the following response from City Mayor's Office on 6/30/2022:

> "The health and safety of our guests and staff is our top priority and we are committed to stopping the spread of COVID-19. While visiting Gracie Mansion, we respectful request that you observe the following key actions from the New York City Health Department:
> [...]"

> We look forward to hosting you at Gracie Mansion. The health and safety of our guests and staff is our top priority and we are committed to stopping the spread of COVID-19. While visiting Gracie Mansion, we respectfully request that you observe the following key actions from the New York City Health Department:
> - Stay home if sick: Stay home if you are sick unless you are leaving for essential medical care (including testing) or other essential errands.
> - Face covering: We advise that you wear a face covering when not eating or drinking. You can be contagious without symptoms and spread the disease when you cough, sneeze or talk. A face covering may help reduce the spread of COVID-19.

71. On 6/30/2022, the Plaintiff attended Mayor Adams' "Caribbean-American Heritage Reception" at the Gracie Mansion, which is the official residence of the Mayor.

72. On 06/30/2022, Mayor Adams posed for photos & videos with attendees in close proximity, including the Plaintiff. Both the Plaintiff and Mayor Adams' faces had less than 1 foot between them, which was far closer than the six feet social distancing required by City Parks policies.

73. According to the Mayors' Office of Special Projects and Community Events press release over 1,000 guests attended Mayor Adams' Caribbean-American Heritage Reception.  These guests included children, community partners, government officials and City workers.

74. The Mayor's decision to hold a large reception with City workers on City property and members of the public without requiring vaccination, testing, masking, or social distancing directly contradicts the City's rationale for mandating COVID-19 vaccination and testing for the upmost safety of the City's workers. This disparity undermines any claim that such requirements were necessary for public safety or that granting religious accommodations would impose an undue hardship for the City.

75. Plaintiff attended the Mayor's reception in the midst of her religious exemption requests, which were pending from 06/14/2022 to 08/23/2022.

76. The City's reluctance to grant Plaintiff reasonable accommodation for COVID-19 testing, yet inviting her to a large event without any safety protocols, demonstrates that the City's denial of Plaintiff's requests on the grounds of "undue hardship" or "direct threat" was not made in good faith.

77. Mayor Adams emphasized the "health and safety of guests" as a top priority, advising mask-wearing and staying home if sick. Yet, by that logic, Plaintiff's vaccination or testing should not have been required for her to work safely for the City.

78. The City's simultaneous maintenance of Executive Orders 75, 78, and others mandating vaccination/testing for City workers, paired with its disregard for these measures at City events, reveals a contradiction that undermines the City's argument that accommodating Plaintiff (from testing) would create an undue hardship and a direct threat to City workers and patrons.

18

**Science Does Not Support PCR Testing As A Diagnostic Tool; Diagnostics Are Needed For A Direct Threat Defense**

79. The City denied Plaintiff's religious accommodation request, claiming she posed a "direct threat" to others without undergoing regular PCR testing.

80. Under *School Board of Nassau County v. Arline*, 480 U.S. 273, 287 (1987), and *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002), any finding of "direct threat" must be based on an individualized assessment using current medical knowledge or the best available objective evidence—not speculative or blanket assumptions.

81. The City failed to perform any such individualized assessment of Plaintiff, and instead categorically denied accommodations based on mandatory PCR testing.

82. Additionally, the City's insistence that the Plaintiff must undergo PCR testing in order to keep others safe lacked scientific merit**.**

83. The PCR test is a laboratory tool that detects fragments of viral RNA.

84. The PCR Test does not distinguish between live, infectious virus or dead viral particles.

85. The PCR Test does not distinguish between Clinical disease and asymptomatic viral presence.

86. The PCR Test does not distinguish between Contagious and non-contagious individuals.

87. The PCR Test does not help distinguish infectious vs infectious individuals.

88. Additionally, the initial development of the CDC's PCR test for SARS-CoV-2 was not based on a fully isolated and purified sample of the virus. At the time the assay was designed, no physical viral isolate was available for validation.

89. Instead, the PCR test was constructed using synthetic RNA sequences derived from a computer-assembled ("in silico") version of the viral genome, which was inferred from patient respiratory samples and publicly released by Chinese researchers in January 2020.

90. As stated in the CDC's own testing protocol submitted to the FDA, the test was developed without a quantified virus isolate and instead relied on laboratory-generated RNA.

91. PCR testing do not accurately identify the Virus or diagnose COVID-19 **or** identify whether an individual is infectious with COVID-19**,** thus failing to satisfy the burden of establishing a "direct threat" under *School Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987).

92. The City's reliance on PCR test results—despite their widely acknowledged inability to confirm infection or infectiousness—renders its "direct threat" rationale unsupported by "current medical knowledge or the best available objective evidence," as required by law. (*Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73 (2002); *Bragdon v. Abbott*, 524 U.S. 624 (1998).

**The City's Testing Policy Was Arbitrary, Discriminatory, And Not Scientifically Justified**

93. The City claims to be making COVID-19 orders based on CDC Guidance.

94. In 2021–2022, the CDC acknowledged that COVID-19 vaccines did not prevent infection or transmission, but instead reduced the risk of severe illness, hospitalization, and death.

95. According to the CDC, both vaccinated and unvaccinated individuals were capable of contracting and transmitting COVID-19, including while asymptomatic.

96. The CDC further recognized that asymptomatic individuals could transmit the virus regardless of vaccination status, and that there was no reliable way to determine who infected whom.

97. Despite this, the City did not require weekly PCR testing for vaccinated employees, even though they too could be contagious.

98. The City also did not require testing, vaccination, or masking for the general public (e.g., park patrons), despite alleging that Plaintiff's presence untested posed a "direct threat."

99. If the City believed weekly testing was necessary to prevent transmission, it should have applied that standard uniformly to all staff and patrons—not just to the unvaccinated Plaintiff.

100. The City's refusal to consider weekly testing as a sufficient alternative for the unvaccinated— while also refusing to test the vaccinated—demonstrates a double standard and undermines the claim that its policy was based on legitimate safety concerns.

101. This policy also contradicts statements by the City's own Health Commissioner, who rejected weekly testing as a "suitable safe alternative" to vaccination—despite the fact that vaccinated individuals were still able to spread the Virus.

102. The City's selective enforcement of its testing mandate—targeting unvaccinated employees while exempting vaccinated staff and the general public—was arbitrary and discriminatory.

103. This inconsistency further undermines the City's assertion that denying Plaintiff a reasonable accommodation was necessary to prevent a "direct threat" to health and safety.

104. Plaintiff repeatedly proposed alternatives, including exemption from testing, based on the fact that vaccinated employees and patrons were not required to test, yet could still be contagious. The City refused to consider this, showing a lack of good faith in its accommodation process.

**Feasible and Reasonable Accommodations, Absent Undue Hardship, Were Available**

105. Under Title VII of the Civil Rights Act of 1964 and the New York City Human Rights Law (NYCHRL), employers must provide reasonable accommodations for sincerely held religious beliefs unless doing so would impose an undue hardship. Reasonable accommodations can include policy exemptions, modified job duties, remote work, or reassignment to a comparable role.

106. In light of the City's inconsistent enforcement of COVID-19 safety policies for vaccinated and unvaccinated staff, patrons, and the general public, the Plaintiff could have been

reasonably exempted from both the COVID-19 vaccine and testing mandates without causing undue hardship.

107. Plaintiff's role as an Aquatics Specialist (dual title: Recreation Specialist) did not require close contact with swimmers. Swim instructors frequently teach from the pool deck, a method commonly used in Plaintiff's prior training, experience, and in observed Parks Department swim classes at Lyons Pool, where Plaintiff likely would have worked.

108. Teaching from the pool deck is a widely accepted and effective instructional method, used for safety, accessibility, and instructional clarity. Instructors and supervisors routinely decide whether to teach from the water or deck. Being that the Plaintiff has swam yearly in the Lyons Pool since 2004, she has witnessed City Aquatics staff teaching from the deck. Plaintiff was taught how to swim from teachers on the deck in her Red Cross and City Parks funded WSI Training and occasionally in her City Parks Learn To Swim classes. It is reasonable to believe she could have taught swim classes from the City Parks pool deck, not in close proximity of others, as a reasonable accommodation.

109. The City previously reassigned the Plaintiff to a non-aquatics playground role during the summer of 2021 due to COVID restrictions, demonstrating that reassignment was feasible. As a Recreation Specialist, Plaintiff was qualified to work in City Parks' playgrounds, community centers, or recreation facilities.

110. The Parks Department could have also placed Plaintiff in an isolated or low-contact position. In the past, Plaintiff was assigned to work alone at two playgrounds without direct interaction with other staff or patrons.

111. The City's argument that Plaintiff posed a "direct threat" based on hypothetical CPR scenarios is unfounded. Lifeguards—not instructors—are responsible for in-water rescues. Additionally, Plaintiff received CPR training using barrier devices to minimize infection risk.

112. In summary, the City had multiple reasonable accommodations available—exemption from testing, teaching from the deck, reassignment to another Recreation Specialist role, or placement in an isolated setting—all of which would have allowed Plaintiff to perform her job without posing a health risk, and without imposing undue hardship on the City.

## CAUSES OF ACTION

### COUNT I – Title VII Religious Discrimination (42 U.S.C. § 2000e-2(a))

113. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

114. Plaintiff is a member of a protected class under Title VII based on her sincerely held religious beliefs.

115. Plaintiff notified the Defendant of her religious objection to the COVID-19 vaccination and testing requirements.

116. Defendant acknowledged the sincerity of Plaintiff's beliefs but denied her a reasonable accommodation.

117. Defendant took adverse action by rescinding her employment offer based on her refusal to comply with the policy.

118. Granting Plaintiff's requested accommodation would not have imposed an undue hardship on the Defendant.

119. Defendant's actions constitute unlawful religious discrimination in violation of Title VII.

**COUNT II – Title VII Retaliation (42 U.S.C. § 2000e-3(a))**

120. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

121. Plaintiff engaged in protected activity by requesting a religious accommodation under Title VII.

122. Defendant retaliated by revoking Plaintiff's job offer after she asserted her rights.

123. The adverse action was causally connected to Plaintiff's protected activity.

124. Defendant's conduct constitutes unlawful retaliation under Title VII.

**COUNT III – First Amendment Free Exercise Violation (via 42 U.S.C. § 1983)**

125. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

126. Defendant, a government entity acting under color of state law, substantially burdened Plaintiff's free exercise of religion.

127. Plaintiff was forced to choose between employment and violating her sincerely held religious beliefs.

128. Defendant failed to demonstrate a compelling governmental interest or apply the least restrictive means.

129. Defendant's actions violated Plaintiff's rights under the First Amendment to the U.S. Constitution.

**COUNT IV – Equal Protection Clause Violation (via 42 U.S.C. § 1983)**

130. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

131. Plaintiff was similarly situated to other unvaccinated and untested City employees and members of the public.

132. Defendant treated Plaintiff differently based solely on her religious objection, while others who posed equal or greater health risks were not similarly penalized.

133. Defendant's disparate treatment lacked a rational basis and was not justified by a compelling government interest.

134. Defendant's conduct violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment.

**COUNT V – Procedural Due Process (via 42 U.S.C. § 1983)**

135. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

136. Plaintiff had a legitimate expectation of employment based on Defendant's job offer.

137. Defendant denied Plaintiff any meaningful notice or opportunity to be heard in connection with the rescission of her employment offer and denial of accommodation.

138. Defendant's actions deprived Plaintiff of procedural due process guaranteed by the Fourteenth Amendment.

**COUNT VI – Substantive Due Process (via 42 U.S.C. § 1983)**

139. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

140. Defendant's actions were arbitrary, capricious, and conscience-shocking.

141. Defendant disregarded Plaintiff's religious rights and failed to consider reasonable, less burdensome alternatives to protect public health.

142. Defendant's actions violated Plaintiff's substantive due process rights under the Fourteenth Amendment.

**COUNT VII – Religious Discrimination and Retaliation under NYSHRL (N.Y. Exec. Law §296)**

143. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

144. Plaintiff is protected under the New York State Human Rights Law as an individual with a sincerely held religious belief.

145. Defendant failed to reasonably accommodate Plaintiff's belief and retaliated against her for asserting her rights.

146. Defendant's conduct constitutes religious discrimination and retaliation under NYSHRL.

**COUNT VIII – Religious Discrimination and Retaliation under NYCHRL (NYC Admin. Code § 8-107)**

147. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

148. Plaintiff is protected under the New York City Human Rights Law as a person with a religious belief.

149. Defendant failed to engage in a cooperative dialogue and failed to reasonably accommodate Plaintiff's belief.

150. Defendant's actions constitute religious discrimination and retaliation under NYCHRL.

151. Pursuant to the NYC Human Rights Law Restoration Act of 2005, these provisions must be construed independently and liberally in favor of the Plaintiff.\

**COUNT IX – Failure to Engage in Cooperative Dialogue (NYC Admin. Code § 8-107(28))**

152. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

26

153. Defendant failed to engage in a good faith cooperative dialogue with Plaintiff regarding her religious accommodation request.

154. Defendant's failure to do so violated NYC Admin. Code § 8-107(28).

**COUNT X – Monell Claim for Municipal Liability (42 U.S.C. § 1983)**

155. Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein.

156. Defendant's actions were taken pursuant to an official policy, custom, or widespread practice of the City of New York.

157. The policy or custom directly resulted in the violation of Plaintiff's constitutional rights, including under the First and Fourteenth Amendments.

158. Defendant City of New York is liable under Monell v. Department of Social Services, 436 U.S. 658 (1978).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and grant the following relief:

159. A declaratory judgment that Defendant violated Plaintiff's rights under [applicable statutes, e.g., Title VII of the Civil Rights Act of 1964, the New York City Human Rights Law, etc.];

160. Compensatory damages to redress Plaintiff's economic losses, including but not limited to: Back pay to account for wages, benefits, and other compensation that Plaintiff lost as a result of Defendant's unlawful conduct, with pre- and post-judgment interest;

161. Punitive damages in an amount sufficient to punish the Defendant for unlawful practices and deter the Defendants from engaging in further unlawful practices;

162. Injunctive relief requiring Defendant to:

    a.    Remove any existing policies and activities that are in defiance of Title VII and related laws.

    b.    City Parks must modify or produce an internal company manual and training materials that outlines how religious exemption requests will be received, processed and honored in compliance with Title VII. The manual must emphasize the importance of:

- Engaging in an "interactive dialogue" or "cooperative dialogue" before dismissing religious exemption requests.

- Obtaining adequate proof of undue hardship, where "undue hardship" means "substantial," before denying an employees' religious exemption request. See *Grof v. DeJoy*

- Obtaining adequate proof that an employee is a direct threat or would pose a direct threat to the workplace even with an accommodation, before using it as a determination to deny a reasonable accommodation.

- Outline best practices to stay legally compliant with Title VII when local and state orders or laws conflict with Title VII obligations.

- Outline best practices to stay legally compliant with Title VII obligations during future pandemics.

163. Policies and procedures relating to an employee's rights under Title VII at the workplace should be made available in the employee handbook so all NYC Parks and/or City of NY employees can be aware of the them. Included in the handbook must be a section on how

Title VII employee rights will be upheld and handled during the event of (1) a pandemic (2) a declared local, state or federal emergency and (3) local and state orders or laws.

164. Conduct training for its managers, supervisors, and employees regarding the legal obligations related to religious accommodations;

165. An order requiring Defendant to issue a formal and public written apology to Plaintiff, acknowledging its violations of Plaintiff's rights and committing to compliance with relevant anti-discrimination laws;

166. An award of Plaintiff's reasonable attorneys' fees, litigation costs, and expenses incurred as a result of this action, as permitted by law;

167. Prejudgment and post-judgment interest as allowed by law; and

168. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

169. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

## SIGNATURE

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11. I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated: New York, NY

7 | 9 | 25

Respectfully submitted,

SILICIA A. JACKSON
PRO SE PLAINTIFF
35 Stage Lane
Staten Island, NY 10304
Telephone: (917) 396-2749
Email: siliciajackson.@hotmail.com

By: _Silicia Anique Jackson_
Silicia Anique Jackson

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2025, I personally submitted the enclosed document to the Clerk of the United States District Court, Southern District of New York by emailing the document to "prose@nysd.uscourts.gov" from email address "siilciajackson@hotmail.com." The subject line read: "Pro-Se Filing – New Case: JACKSON v. THE CITY OF NEW YORK."

Dated: New York, NY

7/9/25

Respectfully submitted,

SILICIA A. JACKSON
PRO SE PLAINTIFF
35 Stage Lane
Staten Island, NY 10304
Telephone: (917) 396-2749
Email: siliciajackson@hotmail.com

By: Silicia Anique Jackson
Silicia Anique Jackson

# EXHIBIT 1.1

1.  EEOC Right To Sue Letter……………………...…….. p. 33 - 34

 **Outlook**

---

**Response: Your Civil Rights Division Report – 594488-LLK from the Employment Litigation Section**

---

**From** DOJ Civil Rights - Do Not Reply <civilrightsdonotreply@mail.civilrights.usdoj.gov>
**Date** Thu 4/10/2025 9:27 AM
**To** SiliciaJackson@hotmail.com <SiliciaJackson@hotmail.com>

---



civilrights.justice.gov

594488-LLK

**NOTICE OF RIGHT TO SUE WITHIN 90 DAYS**

Apr 10, 2025

Silicia A. Jackson

SiliciaJackson@hotmail.com

Re:    Silicia A. Jackson v. City of New York, New York City Dept. of Parks & Recreation, et al.,
EEOC Charge No. 520-2023-02420

Dear Silicia A. Jackson,

You are receiving this notice because you filed the above charge(s) with the Equal Employment Opportunity Commission (EEOC), and you or your attorney specifically requested this notice.

Because either 180 days have passed since you filed the above charge(s), or because the EEOC has determined that it will not be able to conclude its administrative process within 180 days of the date it assumed jurisdiction of the charge(s), you are hereby notified that you have the right to file a lawsuit commencing a civil action based on the charge(s) under the following statute(s):

- Title VII of the Civil Rights Act of 1964, 42 USC. 42 U.S.C. § 2000e, et seq.

EXHIBIT 1.2

If you decide to file a lawsuit under the statute(s) identified above, **you must file it in the appropriate court within 90 days of receiving this Notice**.  This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether your charge is meritorious.  If you haven't already, you may want to consult with a private attorney of your own choosing and expense.

If you have questions or wish to inspect the investigative file pertaining to this matter, please address your inquiry to the following EEOC office: New York District Office. Contact information for this office can be located at https://www.eeoc.gov/field-office/newyork/location.

Sincerely,

Complaint Referral Unit
Employment Litigation Section
Civil Rights Division

## Contact

[civilrights.justice.gov](civilrights.justice.gov)

 U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

 (202) 514-3847
1-855-856-1247 (toll-free)
Telephone Device for the Deaf
(TTY) (202) 514-0716